IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Patrice Williams,                          :
        Petitioner                :
                                  :
        v.                        :  No. 277 C.D. 2023
                                  :
City of Philadelphia                       :  Submitted: February 6, 2024
(Workers' Compensation                     :
Appeal Board),                             :
        Respondent                :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ELLEN CEISLER, Judge
             HONORABLE STACY WALLACE, Judge

OPINION
BY JUDGE McCULLOUGH            FILED: March 21, 2024

In this workers' compensation case, Patrice Williams (Claimant) petitions for review of the March 8, 2023 opinion and order of the Workers' Compensation Appeal Board (Board), which affirmed the July 22, 2022 decision and order of Workers' Compensation Judge Ashley Drinkwine (WCJ). The WCJ granted in part, and denied in part, Claimant's Petition to Review Compensation Benefits (Review Petition), through which she sought to amend the description of her work injury. The WCJ also approved a 20% fee agreement between Claimant and her counsel, but limited its application to indemnity benefits only. The Board affirmed the WCJ. As set forth below, we affirm the Board in part, and reverse in part.

## I.    **FACTS AND PROCEDURAL HISTORY**

On March 4, 2021, Claimant sustained work-related injuries during the scope and course of her employment with the City of Philadelphia (Employer) as a correctional officer at the Curran Fromhold Correctional Facility. On July 22, 2021, Employer issued an Amended Notice of Compensation Payable (NCP) acknowledging

injuries described as a thumb strain or tear, right wrist sprain, right hand sprain, and right shoulder sprain. Employer paid wages in lieu of compensation benefits effective March 5, 2021.

On August 2, 2021, Claimant filed a Claim Petition in which she alleged that she also sustained work-related injuries in the nature of carpal tunnel syndrome and aggravation of preexisting arthritis. She accordingly sought temporary total disability benefits payable as of July 1, 2021, together with medical expenses and counsel fees. At the first hearing on the Claim Petition on September 13, 2021, Claimant moved to convert the Claim Petition to a Review Petition and amend the original injury description to include carpal tunnel syndrome. In response, on December 10, 2021, Employer issued a second Amended NCP that expanded the description of Claimant's injury to include carpal tunnel syndrome. At a hearing on December 13, 2021, Claimant moved to amend her Review Petition to add right lateral epicondylitis to her injury description, which addition was the only remaining contested issue before the WCJ.

In support of her Review Petition, Claimant submitted her October 11, 2021 deposition testimony and also testified live. At her deposition, Claimant testified that she was injured while wringing out a mop. She felt pain in her right thumb that then traveled to her right shoulder. (Claimant's Dep., 10/11/21, at 5-6, 8, 31; Reproduced Record (R.R.) at 8a-9a, 11a, 34a.) Claimant initially treated with Concentra[1] and later a pain management specialist and her primary care physician. *Id.* at 8-9; R.R. at 11a-12a. X-rays of Claimant's hand, wrist, and shoulder were taken, as well as magnetic resonance images (MRI) of her hand, wrist, and thumb. *Id.* at 31-32;

---

[1] Concentra provides occupational health services for, *inter alia*, work-related illnesses and injuries. *See* About Concentra, available at https://www.concentra.com/about-us/ (last visited March 20, 2024).

R.R. at 34a-35a. Claimant eventually also treated with Dr. Zena Zingerman and underwent physical therapy, shock treatment, heat, and strength training. *Id.* at 12-13, 40; R.R. at 15a-16a, 43a. As of the date of her deposition, Claimant was having difficulty with her right hand and arm but could perform tasks such as driving and, occasionally, house cleaning. *Id.* at 14-15, 47-48; R.R. at 17a-18a, 50a-51a.

Before the WCJ on March 7, 2022, Claimant testified that she has numbness and tingling around her wrist and pain that extends into her forearm. (Notes of Testimony (N.T.), 3/7/22, at 7-8; R.R. at 113a-14a.) Regarding her elbow, Claimant testified that it is painful to the touch and is uncomfortable at night. *Id.* at 10; R.R. at 116a. Claimant was still treating with Dr. Zingerman at this time, and she testified that she had complained of elbow pain to Dr. Zingerman in August 2021. *Id.* at 10, 14-15; R.R. at 116a, 120a-21a. Claimant acknowledged, however, that she did not complain of elbow pain while treating at Concentra and never had an x-ray or MRI of her elbow. *Id.* 13-14; R.R. at 119a-20a.

Claimant also submitted the deposition testimony of Dr. Zingerman, a medical doctor who chiefly treats patients with neuromusculoskeletal problems and functional deficits following chronic disease or surgery. (Zingerman Dep., 12/8/21, at 6-7; R.R. at 76a-77a.) When Claimant first treated with Dr. Zingerman in August 2021, Claimant complained of pain through her right wrist, forearm, and upper arm, and numbness in her first, second, and third fingers. *Id.* at 8; R.R. at 78a. Dr. Zingerman performed a physical examination of Claimant on August 5, 2021, which revealed that Claimant had full and painless range of motion in her right elbow and tenderness distal to the lateral epicondyle. *Id.* at 9-10; R.R. at 79a-80a. A tennis elbow test also was negative. *Id.* at 10; R.R. at 80a. Based on the examination, Dr. Zingerman initially

3

diagnosed Claimant with "[r]ight carpal tunnel syndrome, right lateral epicondylitis, [and] myofascial pain affecting [the] upper extremity." *Id.*

Dr. Zingerman continued to treat Claimant with physical therapy. During a follow-up appointment in August 2021, Claimant continued to complain of right wrist and hand pain and numbness in her first three fingers. *Id.* at 10-11; R.R. at 80a-81a. An MRI of Claimant's hand and wrist showed "mild arthritic changes at the [scaphotrapeziotrapezoidal (STT)] joint," moderate arthritic changes at the "first carpometacarpal (CMC)]," "first interphalangeal joint osteoarthritis," and "moderate first [CMC] joint osteoarthritis." *Id.* at 11; R.R. at 81a. At a visit on October 13, 2021, Claimant's diagnoses were expanded to include right carpal tunnel syndrome and right lateral epicondylitis. *Id.* at 12; R.R. at 82a. At the time, Claimant was "complaining of ongoing right wrist, forearm, and elbow pain, as well as numbness in the first three digits," and she "continued to experience difficulty using [her] right upper extremity to perform daily functional tasks, such as driving, grasping, lifting items, and opening or closing jars." *Id.* at 13; R.R. at 83a. During an examination on October 28, 2021, Dr. Zingerman noted similar ongoing conditions, including "right elbow radial tenderness over [the] lateral epicondyle." *Id.* at 14; R.R. at 84a. Based on her collective evaluations and review of diagnostic study results, Dr. Zingerman ultimately diagnosed Claimant with right carpal tunnel syndrome and right lateral epicondylitis, both of which she related to Claimant's work injury. *Id.* at 15; R.R. at 85a.

For its case, Employer submitted the deposition testimony of its medical expert, Dr. Jack Abboudi. Dr. Abboudi is a board-certified orthopedic surgeon who has an additional certification in hand surgery. (Abboudi Dep., 2/22/22, at 7; Supplemental Reproduced Record (S.R.) at 007b.) Dr. Abboudi has been performing orthopedic surgery with a specific specialty and focus of the upper extremities since

4

2000. *Id.* at 6; S.R. at 006b. His practice includes treatment of carpal tunnel syndrome and lateral epicondylitis. *Id.* at 8; S.R. at 008b. Dr. Abboudi performed an independent medical examination (IME) of Claimant on November 3, 2021. As part of his examination, he reviewed Dr. Zingerman's August 5, 2021 report. *Id.* at 10-11; 16-17; S.R. at 010b-11b, 016b-17b. He also performed a physical examination of Claimant, including her elbow. He noted that she had normal range of motion with no abnormalities, no tenderness at the epicondyle, and no instability. *Id.* at 22; S.R. at 022b. Based on his observations, Dr. Abboudi determined that Claimant was fully recovered from her hand, wrist, and shoulder strains. He further determined that she had arthritis in her thumb that pre-dated, and was not aggravated by, her work injury. *Id.* at 31-33; S.R. at 031b-33b. He nevertheless diagnosed her with work-related carpal tunnel syndrome in her right wrist. *Id.* at 31; S.R. at 031b.

With regard to lateral epicondylitis specifically, Dr. Abboudi prepared a supplemental report in which he noted that Claimant showed no evidence of lateral epicondylitis during her examination on November 3, 2021. He observed that Claimant did not complain of elbow pain to him or to the physicians who treated her close in time to her work injury. He further noted that none of Claimant's treating physicians, except Dr. Zingerman, diagnosed lateral epicondylitis. *Id.* at 36-39; 58-59; 105-106; S.R. at 036b-39b; 058b-59b; 105b-06b. In preparation of his supplemental report, Dr. Abboudi reviewed the deposition transcript of Dr. Zingerman and her treatment records and emphasized that the only findings from Dr. Zingerman that arguably were consistent with lateral epicondylitis were those from October 28, 2021. *Id.* at 039-42; S.R. at 039b-42b. Dr. Abboudi examined Claimant six days after Dr. Zingerman and did not make the same findings. *Id.* at 42-43; S.R. at 042b-43b. Additionally,

5

Claimant's test for "tennis elbow," the lay term for lateral epicondylitis, was negative.

*Id.* at 39-42; S.R. at 039b-42b. Dr. Abboudi summarized his opinion as follows:

> So, putting all this together, I do[ not] see any validation to this complaint. I do[ not] see any substantiation of it objectively[.] [N]ot only me, [but] 16 other medical doctor encounters have also failed to find this diagnosis. And even Dr. Zingerman's own notations are inconsistent where she mentions the diagnosis, but her examination indicates that it[ is] negative.

*Id.* at 41; S.R. at 041b.

Claimant submitted a claim for counsel fees, and in support introduced a fee agreement executed with her counsel on July 28, 2021 (Fee Agreement). The Fee Agreement states, in pertinent part, as follows:

> [O]nce the contingency does occur my attorney . . . will receive [20] percent (20%) of all compensation payable to me for as long as I receive workers' compensation benefits. This includes payment for all medical treatment and hospital bills. I understand that the medical provider m[ay] seek payment from me for twenty percent of the medical bills[.] I have been advised by my attorney that [the provider] cannot [do] so in accordance with Section 306(f.1)(7) of the Workers' Compensation Act[(Act)],[2] 77 P.S. [§] 531(7).
>
> . . . .
>
> The contingency is the award by any worker[s'] compensation judge of a fee of twenty percent deductible from any award of wage loss or medical benefits or of any order permitting me to continue to receive wage loss or medical benefits. Once this contingency occurs, the deduction of the [20%] fee will continue for the full duration of the time that I continue to receive wage loss or medical benefits.

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710. Section 306(f.1)(7) was added by the Act of July 2, 1993, P.L. 190, No. 44.

(R.R. at 3a.)  At Claimant's deposition, the following exchange occurred regarding the

Fee Agreement:

> Q[By Attorney Kerzner].     You have a fee agreement with my office that if you're successful in this litigation we would receive 20[%] of your benefits as a fee for representing you, right?
>
> A[Claimant].     Right.
>
> Q.     Is that acceptable to you?
>
> A.     Right.  I signed it.
>
> Q.     Yes.  And when you signed, you were aware of what it said, right?
>
> A.     Yes.
>
> . . . .
>
> Q.     Miss Williams, the fee agreement that you signed specifically stated that the attorney's fee can be deducted on wage loss benefits, in other words, the checks you're getting now.  It also says that, pursuant to what the courts of this Commonwealth have stated, it could be deducted off of any doctor bills that the employer pays, treatment that you've had.  If [it pays] a bill, then our fee agreement would entitle us to 20[%] off of that doctor's bills.  Do you understand that?
>
> A.     Yes.
>
> Q.     What the [j]udges want us, in particular, to ask you about, and all injured workers, is—there is a possibility—we don't believe that it's a strong possibility, but there is a theoretical possibility that a doctor who has 20[%] of [his or her] bill deducted for an attorney's fee—so, in other words, the employer pays [the doctor] 80[%] of [the] bill, and your attorney gets 20[%] of that bill as a fee for having won the doctor's right to get paid from that bill.  There's a possibility the [doctor] might turn around and seek that from the injured worker.
>
> . . . .

7

Q. The doctor might turn around and seek that from the injured worker because [the doctor] received from the employer as payment 80[%] of [the] bill. Now, our fee agreement provides for that deduction of 20[%] from the doctor's bill to be paid to us as an attorney's fee. Did you understand, fully, what I've just explained to you and did you understand that when you signed the fee agreement, in other words, a 20[%] attorney's fee is deductible from all benefits? An injured worker gets both wage loss and medical benefits. You understand that?

A. Yes.

Q. That 20[%] is payable from both your checks and from the doctor's bills; do you understand that?

A. Yes.

Q. You understand that the theoretical possibility exists that a doctor, whoever it might be, might seek that 20[%] that's been cut off [his or her] bill, might turn around and ask you for that; you understand that that possibility exists?

A. Yes.

Q. Now, knowing that—and I've explained all of this to you, I think, in great detail—do you consent to this [F]ee [A]greement?

A. Consent to what?

Q. Do you consent to this [F]ee Agreement?

A. Yes.

(Claimant's Dep., 10/11/21, at 16-20; R.R. at 19a-23a.)[3]

The WCJ granted the Review Petition, in part. The WCJ found that Claimant suffered from carpal tunnel syndrome in addition to the conditions previously acknowledged by Employer. (WCJ Finding of Fact (FOF) 12; R.R. at 140a.) The WCJ additionally found, however, that Claimant did not suffer from lateral epicondylitis.

---

[3] Claimant also acknowledged the Fee Agreement in her live testimony before the WCJ on March 7, 2022. (N.T., 3/7/22, at 10-11; R.R. at 116a-17a.)

8

(FOF 13; R.R. at 140a.) The WCJ supported her findings with the following evidentiary weight and credibility determinations:

9. [The WCJ] has carefully reviewed the deposition and hearing testimony of Claimant and finds Claimant to be credible and persuasive, except for her testimony regarding complaints specific to her left elbow. In making this determination, [the WCJ] relies on the following: Claimant has a 25-year work history with Employer. Claimant made attempts to work modified duty when released to do so, before being placed out of work by Concentra. This determination is also based in part on [the WCJ's] opportunity to observe Claimant's demeanor and comportment when she testified live by video at the hearing before this [WCJ]. In rejecting Claimant's testimony as it relates to left elbow complaints, this [WCJ] notes that Claimant initially related radiating pain up her arm but did not relate complaints to the elbow specifically. Moreover, Claimant's October 11, 2021[ ] deposition did not include any testimony regarding complaints specific to the elbow.

10. This [WCJ] has carefully reviewed the testimony of Dr. Abboudi and finds Dr. Abboudi credible regarding the alleged lateral epicondylitis. In making this determination, [the WCJ] relies on the following: Dr. Abboudi is a board-certified orthopedic surgeon, with an added qualification in the upper extremity. Further, he reviewed relevant records, including diagnostic studies and films from the hand and wrist MRI. Dr. Abboudi's opinion that Claimant did not sustain lateral epicondylitis was corroborated by the lack of findings to the elbow on physical examination. In addition, Dr. Abboudi explained that even Dr. Zingerman's testing for epicondylitis was negative, which further supports Dr. Abboudi's opinion. Finally, his credibility is bolstered by his logical explanation of the timing of symptoms and how this leads to a conclusion that these symptoms are not work related. [The WCJ] notes that both medical experts agree that Claimant sustained right carpal tunnel syndrome as a result of the work injury, which is also found to be credible.

9

11. [The WCJ] has carefully reviewed the testimony of Dr. Zingerman and, to the extent that Dr. Zingerman's opinions are contrary to the credible opinions of Dr. Abboudi related to the alleged lateral epicondylitis, [the WCJ] finds the same to be neither credible nor persuasive. In making this determination, [the WCJ] relies on the following: Dr. Zingerman is not an upper extremity specialist. Dr. Zingerman did not adequately explain the rational[e] for the diagnosis of lateral epicondylitis, given that her own physical examination testing was negative. Dr. Zingerman did not review any medical records that pre-date her treatment, aside from diagnostic study reports. Again, [the WCJ] notes that both medical experts agree that Claimant sustained right carpal tunnel syndrome as a result of the work in jury, which is found to be credible.

(FOF 9-11; R.R. at 139a-40a.)

Regarding Claimant's requested counsel fee, the WCJ found as follows:

Claimant and her counsel have a [Fee Agreement] in the amount of twenty percent (20%) of Claimant's indemnity and medical benefits. The same is approved with respect to Claimant's indemnity benefits. However, Claimant's counsel's fee is not approved with respect to future medical benefits, as these are unknown costs, and [the WCJ] does not believe it can be demonstrated that Claimant understands her potential future exposure and liability regarding presently unknown costs.

(FOF 7; R.R. at 139a.)

Claimant appealed to the Board, which affirmed the WCJ. The Board concluded that Dr. Abboudi's medical testimony constituted substantial evidence to support the WCJ's finding that Claimant does not suffer from lateral epicondylitis. (Board Op. at 4-5; R.R. at 148a-49a.) With regard to the WCJ's limited counsel fee award, the Board concluded that, because Claimant's future medical bills are unknown and speculative, she could not comprehend or anticipate when she executed the Fee Agreement the actual amounts she could be required to reimburse to her medical

10

providers. *Id.* at 10-12; R.R. at 154a-55a. Accordingly, and distinguishing this case from our recent decision in *Neves v. Workers' Compensation Appeal Board (American Airlines)*, 232 A.3d 996 (Pa. Cmwlth. 2020) (*en banc*), the Board concluded that, notwithstanding the language of the Fee Agreement, Claimant could not agree to a counsel fee that included 20% of future, unknown medical expenses. *Id.*

Claimant now appeals to this Court.

## II. ISSUES

Claimant presents three issues for our review, which fairly can be condensed into two, namely, (1) whether the Board erred in affirming the WCJ's denial of an attorney's fee based on Claimant's medical bills; and (2) whether the Board erred in affirming the WCJ's determination that Claimant did not suffer lateral epicondylitis as part of her work-related injury. For ease of analysis, we address the issues in reverse order.

## III. DISCUSSION[4]

### A. Lateral Epicondylitis

Claimant argues that the WCJ's finding that Claimant does not suffer from lateral epicondylitis as a result of her work injury is not supported by substantial evidence and, therefore, is an abuse of discretion. More specifically, Claimant argues that her medical evidence, chiefly the testimony, report, and diagnostic findings of Dr. Zingerman, constituted substantial evidence establishing that she suffers from lateral epicondylitis. (Claimant's Br. at 21.) Claimant then points out that Dr. Abboudi's

---

[4] Our review is limited to determining whether constitutional rights have been violated, whether an error of law has occurred, and whether the WCJ's findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704; *Crocker v. Workers' Compensation Appeal Board (Georgia Pacific LLC)*, 225 A.3d 1201, 1205 n.6 (Pa. Cmwlth. 2020).

11

opinion that Claimant does not suffer from lateral epicondylitis was based on only a single physical examination which, Claimant appears to contend, does not constitute substantial, competent medical evidence upon which the WCJ could rely to make her findings. (Claimant's Br. at 22.) We disagree.

Our consideration of Claimant's argument in this regard is governed by the following long-held principles:

> [I]t is a fundamental tenet of workers' compensation law that the WCJ, as fact-finder, has complete authority over questions of witness credibility and evidentiary weight. For purposes of appellate review, it is irrelevant whether there is evidence to support contrary findings; if substantial evidence supports the WCJ's necessary findings, those findings will not be disturbed on appeal. As the ultimate fact-finder, the WCJ . . . is free to accept or reject the testimony of any witness, including a medical witness, in whole or in part.[5] A court may overturn a credibility determination only if it is arbitrary and capricious or so fundamentally dependent on a misapprehension of facts, or so otherwise flawed, as to render it irrational.

*Verizon Pennsylvania Inc. v. Workers' Compensation Appeal Board (Mills)*, 116 A.3d 1157, 1162 (Pa. Cmwlth. 2015) (internal citations and quotations omitted). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *West Penn Allegheny Health System, Inc. v. Workers' Compensation Appeal Board (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021) (citation omitted). In determining whether a particular finding by the WCJ is supported by substantial evidence, "this Court must consider the evidence as a whole, view the evidence in a light most favorable to the party who prevailed before the WCJ,

---

[5] Moreover, in making these credibility determinations, a WCJ may reject the testimony of any witness, even where that testimony is uncontradicted. *Hawbaker v. Workers' Compensation Appeal Board (Kriner's Quality Roofing Services and Uninsured Employer Guaranty Fund)*, 159 A.3d 61, 69 (Pa. Cmwlth. 2017) (citation omitted).

12

and draw all reasonable inferences which are deducible from the evidence in favor of the prevailing party." *Verizon Pennsylvania Inc.*, 116 A.3d at 1162 n.4 (citing *Sell v. Workers' Compensation Appeal Board (LNP Engineering)*, 771 A.2d 1246, 1251 (Pa. 2001), and *Waldameer Park, Inc. v. Workers' Compensation Appeal Board (Morrison)*, 819 A.2d 164, 168 (Pa. Cmwlth. 2003)).

Here, the WCJ found Dr. Abboudi's testimony regarding lateral epicondylitis to be more credible than that of Dr. Zingerman for several reasons. The WCJ noted that Dr. Abboudi conducted a physical examination of Claimant and did not note any indicators of lateral epicondylitis. Dr. Abboudi further reviewed Dr. Zingerman's treatment records and noted that only a single examination had results arguably consistent with lateral epicondylitis, while all of the others, including the tennis elbow test itself, showed no signs of the condition. The WCJ also noted and credited Dr. Abboudi's observation that Claimant did not complain of or treat for elbow pain close in time to her work injury. Rather, the complaints of elbow pain came much later, which delay Dr. Abboudi concluded was an indication that the symptoms were not work related. (FOF 10, 11.) Based on his own observations and the gaps and weaknesses he observed in Dr. Zingerman's records and diagnoses, Dr. Abboudi opined that Claimant's work-related injury did not include lateral epicondylitis.

Reviewing the record in the light most favorable to Employer, we find that the WCJ's credibility determinations in this regard are supported by substantial evidence and are not arbitrary, capricious, or based on a misapprehension of any facts. The WCJ thoroughly explained her reasons for crediting Dr. Abboudi's testimony, and those reasons are amply supported by the record. Accordingly, we must, and here do, affirm them.

13

## B.     Counsel Fees[6]

Claimant next argues that the WCJ erred in approving a counsel fee limited to 20% of her indemnity benefits and excluding any portion of her medical benefits.  She asserts that she clearly understood the terms of the Fee Agreement and that the agreed-upon fee poses no financial risk to her because, pursuant to Section 306(f.1)(7) of the Act, 77 P.S. § 531(7), her medical providers cannot seek to recoup from her any portion of their future reimbursable medical costs used to pay the fee.  Thus, and relying on this Court's decision in *Neves*, she contends that the Board erred in affirming the WCJ's decision and order in this respect.  We must agree.

Section 442 of the Act, added by the Act of February 8, 1972, P.L. 25, 77 P.S. § 998, authorizes counsel fees limited to no more than 20% of the "amount awarded."  It provides as follows:

> All counsel fees, agreed upon by [a] claimant and his attorneys, for services performed in matters before any workers' compensation judge or the [B]oard, whether or not allowed as part of a judgment, shall be approved by the workers' compensation judge or [B]oard as the case may be, providing the counsel fees do not exceed twenty per centum of the amount awarded.
>
> In cases where the efforts of [a] claimant's counsel produce a result favorable to the claimant but where no immediate award of compensation is made, such as in cases of termination or suspension, the hearing official shall allow or award reasonable counsel fees, as agreed upon by [the] claimant and his attorneys, without regard to any per centum.

---

[6] Employer takes no position on the issue of counsel fees and does not address it in its brief. *See* Pennsylvania Rule of Appellate Procedure 2112 ("Unless the appellee does so, or the brief of the appellee otherwise challenges the matters set forth in the appellant's brief, it will be assumed the appellee is satisfied with them, or with such parts of them as remain unchallenged.").

> In the case of compromise and release settlement agreements, no counsel fees shall exceed twenty per centum of the workers' compensation settlement amount.

77 P.S. § 998.[7]

In *Neves*, we considered at length the scope of the Act's authorization of counsel fees calculated as a percentage of a claimant's medical benefits. There we considered the effect of a written fee agreement providing, in pertinent part, that the claimant agreed "to pay [his] attorney a sum equal to 20[%] of whatever may be recovered from [the workers' compensation] claim." 232 A.3d at 999. The claimant in *Neves* also submitted an affidavit in which he attested that he entered into the fee agreement with his counsel and understood that it applied to "past due medical expenses as well as any wage loss benefits."[8] *Id.* The claimant further acknowledged in the affidavit his understanding that "providers may seek the balance of the [20%] of the bill from [him] should they be dissatisfied with the [80%] they will receive." *Id.* Relying on this Court's decision *Piergalski v. Workmen's Compensation Appeal Board (Viviano Macaroni Company)*, 621 A.2d 1069 (Pa. Cmwlth. 1993), the workers' compensation judge approved the fee agreement only as it applied to the claimant's indemnity benefits because the claimant did not present evidence establishing that a contingent fee on medical benefits was reasonable. *Id.* at 999-1000. The Board affirmed.

---

[7] Section 440(a) of the Act, added by Section 3 of the Act of February 8, 1972, P.L. 25, 77 P.S. § 996, also authorizes an award of a reasonable sum of counsel fees and other expenses in cases where a claimant prevails and an employer's contest of benefits is determined to be unreasonable. Here, the WCJ found Employer's contest to be reasonable and, accordingly, determined that "no unreasonable contest fee will be awarded." (FOF 14; R.R. at 140a.)

[8] The medical expenses in *Neves* were past-due medical bills from the claimant's hospitalization. 232 A.3d at 999.

15

On appeal to this Court, we reversed. We first reviewed the history of counsel fee awards in workers' compensation cases and the decisions of this Court establishing the standards applicable to such awards. *Id.* at 1000-06. We then stated:

> The above-described case law has established several key principles with respect to a contingent fee agreement presented to a WCJ for approval under Section 442 of the Act. First, the counsel fee should be calculated against the entire award, without regard for whether the award is for medical or indemnity compensation. Second, the terms of the fee agreement govern, and it is incumbent upon the claimant to establish that the parties intended that the counsel fee be applied to the entire award, including medical compensation.

*Id.* at 1005 (internal citations omitted). Applying these principles to the claimant's fee agreement, we concluded as follows:

> First, [the WCJ] erred by concluding that a medical compensation award is not part of "the amount awarded," on which a counsel fee is calculated under Section 442 of the [WC] Act. That is contrary to this Court's precedent that has held, repeatedly, that "the amount awarded," as used in Section 442, means the entire award, without regard for whether the award is for indemnity or medical compensation or both.
>
> Second, the fee agreement here expressly provided that [the c]laimant "agrees to pay his attorney a sum equal to 20[%] of whatever may be recovered from said claim." [The WCJ] awarded [the c]laimant both indemnity and medical compensation and then found that [c]ounsel was entitled to "20% of any benefits awarded to be paid as counsel fees" under the fee agreement. . . .
>
> In an aside, [*Koszowski v. Workmen's Compensation Appeal Board (Greyhound Lines, Inc.)*, 595 A.2d 697 (Pa. Cmwlth. 1991),] observed that if 20% of "medical expenses is to be awarded to [a] claimant's attorney, then the question arises as to who is responsible for the balance of medical expenses due the medical supplier." [*Id.*] at 702 n.6. Indeed, the

16

*Koszowski* concurring opinion observed that there was a potential conflict of interest between the attorney and his client on this point and suggested that the conflict be addressed at the time the fee agreement is made. Here, the fee agreement addresses these concerns. [The c]laimant expressly acknowledged in the fee agreement that he may be liable to the medical provider for the 20% withheld from the award for [c]ounsel's fee.

. . . .

We hold that Section 442 does not distinguish between the type of compensation awarded; does not require an inquiry into the reasonableness of a 20% fee agreement; and does not make the amount and degree of difficulty of the work performed by the attorney relevant. A 20% counsel fee is *per se* reasonable.

. . . .

Here, the . . . fee agreement provided that "20% of any benefits awarded" would be paid as counsel fees, . . . and this applied to both medical and disability compensation benefits. The Board erred in holding that a *quantum meruit* analysis had to be undertaken with respect to the medical compensation portion of [c]ounsel's fee. That requirement was neither required nor authorized by Section 442 of the Act.

*Id.* at 1005, 1006-08 (internal citations, brackets, emphasis, and footnote omitted).[9]

---

[9] We also noted in *Neves* that our decision in *Koszowski* was decided before the enactment of Section 306(f.1)(7) of the Act, 77 P.S. § 531(5), which "implemented medical cost savings and, *inter alia*, prohibited providers from 'balance billing' claimants." *Neves*, 232 A.3d at 1006 n. 6. Section 306(f.1)(5) provides as follows:

A provider shall not hold an employe[e] liable for costs related to care or service rendered in connection with a compensable injury under this act. A provider shall not bill or otherwise attempt to recover from the employe[e] the difference between the provider's charge and the amount paid by the employer or the insurer.

77 P.S. § 531(7). *See also* 34 Pa. Code. § 127.211(a), (b). Providers may nevertheless dispute the amount or timeliness of payments from an employer by seeking a fee review from the Department of **(Footnote continued on next page…)**

In its opinion, the Board acknowledged our decision in *Neves*, but distinguished it on the ground that the medical bills in *Neves* were fixed and had already been incurred at the time of the hearing before the workers' compensation judge. Here, because Claimant's future medical expenses are speculative and undefined, the Board determined that those expenses cannot form the basis of the counsel fee award. (Board Op. at 10-11; R.R. at 154a-55a.) Specifically, the Board held as follows:

> Claimant testified she understood that the [F]ee [A]greement between herself and her counsel included 20[%] of both wage loss and medical benefits, and that her medical providers could "theoretically" try to obtain 20[%] of the medical bills from her. At this point, Claimant's medical benefits are speculative and open-ended with the potential to stretch into the indefinite future. Even though she testified to her understanding of the [F]ee [A]greement, we conclude that as a matter of law, Claimant, a layperson, lacks the sophistication to comprehend or anticipate what might happen in the future, possibly years down the road, with her medical treatment or how much money she could actually be responsible for reimbursing to her medical providers. The outcome is contrary to the very purpose of the Act, which is remedial in nature and is intended to benefit workers. Claimant should not be placed into such a situation particularly where, as here, her interests and those of her counsel are potentially in conflict with one another and Claimant is essentially acting *pro se* as to any [F]ee [A]greement issues, and there is no evidence that Claimant's medical providers agreed to accept only 80% of the repriced bills as total payment. In sum, because [of] the differences between this case and [*Neves*], the WCJ did not err in approving the [F]ee [A]greement between Claimant and her counsel under Section 442 of the Act as to indemnity benefits, but not medical benefits.

---

Labor and Industry. Section 306(f.1)(5) of the Act, 77 P.S. § 521(5). *See also Neves*, 232 A.3d at 1002.

(Board Op. at 11-12; R.R. at 155a-56a.)[10]   In this respect, the Board erred and misapplied our holding in *Neves*.

First, the rule from *Neves* is broad and not limited to only those medical expenses that have been actually incurred and billed at the time of a hearing before a workers' compensation judge.  In many cases, including this one, at least a portion of a claimant's medical expenses are incurred *after* the claimant executes a fee agreement with his or her counsel.  Very few claimants, if any, will have a complete and certain picture of their future medical treatment at the time they retain counsel, and the Board's suggestion that a fee agreement, otherwise *per se* reasonable, is invalid because it is based on unknown and "speculative" future medical expenses is untenable under *Neves* and Section 442 of the Act.  We therefore reject outright the Board's conclusion that, as a "matter of law," Claimant *could not* agree to a 20% fee agreement that applies to future and yet-unknown medical expenses.[11]

Second, we plainly acknowledged in *Neves* the exact risk and potential conflict of interest identified by the Board regarding who will be responsible for the balance of medical expenses due to a provider if 20% of the payments are used to pay a counsel fee.  *Neves*, 232 A.3d at 1006.  We noted that the fee agreement in *Neves* addressed those concerns via the claimant's written acknowledgement that he might be liable to a medical provider for the 20% withheld for counsel fees.  *Id.*   Here, the Fee Agreement includes express language through which Claimant acknowledged that she

---

[10] One Commissioner dissented, concluding that the Fee Agreement was *per se* reasonable. (Board Op. at 13; R.R. at 157a.)

[11] Claimants' indemnity benefits can fluctuate and be as unpredictable as their medical benefits.  When executing fee agreements, claimants do not know when or if they will return to work, if at all, either full- or part-time; nor do claimants know if concurrent employment, supplemental income, or other circumstances will result in an increase or decrease of the amount and/or duration of their indemnity benefits.

19

understood that the counsel fee would be calculated based on both her indemnity and medical benefits and that a provider could, at least theoretically, seek to recover from her the balance of any unpaid medical bills. (R.R. at 3a.) She also testified, on two separate occasions, that she executed the Fee Agreement and understood the 20% counsel fee deduction. These facts are sufficient under *Neves* and Section 442 of the Act to validate the Fee Agreement. Any suggestion by the Board that a fixed amount or *quantum meruit* analysis is a necessary prerequisite to the enforcement of a fee agreement applicable to future medical benefits was error.[12]

Third, Section 306(f.1)(7) of the Act prohibits providers from recovering from claimants any portion of any costs related to any care or services rendered for a compensable injury, including the difference between a provider's charge and the amount paid by an employer or insurer. 77 P.S. § 531(7). *See also Neves*, 232 A.3d at 1006 n.6. Claimant acknowledged in the Fee Agreement that she had been advised by her counsel that, although a medical provider may seek reimbursement from her for any counsel fees deducted from the payment of medical bills, the providers "cannot [do] so in accordance with Section 306(f.1)(7) . . . ." (R.R. at 3a.) To our knowledge, this Court has never directly addressed the question of whether this prohibition on "balance billing" applies to shield claimants from medical providers seeking to recoup the 20% counsel fee deducted from an employer's or insurer's payments. In *Righter*, this Court suggested, again in dicta, that Section 306(f.1)(7) would not prohibit a medical provider from "balance billing" a claimant for deducted counsel fees. Rather,

---

[12] Along this line, in *Neves* we distinguished the three-judge panel decision of this Court in *Righter v. Workers' Compensation Appeal Board (Righter Parking)*, 141 A.3d 628 (Pa. Cmwlth. 2016), where we concluded that a claimant had not, in fact, agreed to a counsel fee that included 20% of her indemnity *and* medical benefits. *Righter*, 141 A.3d at 628, 633. In *Neves*, we also noted that any discussion in *Righter* of the reasonableness of the fee or the necessity of a *quantum meruit* analysis was dicta and, therefore, not controlling. *Neves*, 232 A.3d at 1005.

20

it would only prohibit providers from billing a claimant for the difference between the provider's normal rate and the Medicare-adjusted reimbursement rates established by the Act. *Righter*, 141 A.3d at 634.

Upon further review, however, we do not read Section 306(f.1)(7) so narrowly. Instead, that section states plainly and without qualification that

> [a] provider shall not hold an employe[e] liable for costs related to care or service rendered in connection with a compensable injury under this act. A provider shall not bill or otherwise attempt to recover from the employe[e] the difference between the provider's charge and the amount paid by the employer or the insurer.

77 P.S. § 531(7). Thus, Section 306(f.1)(7)'s prohibition on "balance billing" is not limited to only the difference between a provider's normal fee and the Medicare-approved reimbursement rate. Rather, it prohibits a provider from billing a claimant for *any* costs related to care provided under the Act and *any* amounts reflecting the difference between the provider's charge and the amount paid. And, as we noted in *Neves*, a provider may seek a fee review pursuant to Section 306(f.1)(5) of the Act, 77 P.S. § 531(5). That statutory vehicle, and not private "balance billing" to claimants, is the mechanism afforded to providers to dispute any portion of an approved fee. Accordingly, the fact that the Fee Agreement here specifically advised Claimant that providers might seek to, but nevertheless may not, recover from her the amount paid as a counsel fee only reinforces our conclusion that she understood the Fee Agreement and its implications.

Finally, although we acknowledge the competing interests and policy considerations involved with counsel fee awards, we nevertheless reiterate the sentiments we first articulated in *Neves*:

> There may be policy reasons . . . to regulate the counsel fee differently, depending on whether the fee was incurred for

21

> pursuing an award of medical compensation as opposed to indemnity compensation. These policy concerns should be addressed to the General Assembly. Simply, the wisdom of the policy behind legislative enactments is generally not the concern of the court. The Court's job is to interpret legislative enactments and not to promulgate them. When a statute is clear and free from ambiguity, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b).

*Neves*, 232 A.3d at 1007-08 (most internal citations and quotations omitted). Here, our decision in *Neves* and the language of Section 306(f.1)(7) are clear. A 20% counsel fee agreement applicable to all workers' compensation benefits received by a claimant is *per se* reasonable. A medical provider that provides medical services to treat a compensable injury under the Act may not recoup directly from a claimant any portion of any payment deducted to pay a counsel fee.

## IV.  CONCLUSION

The Board did not err in affirming the WCJ's finding that Claimant does not suffer from lateral epicondylitis. The Board did err, however, in affirming the WCJ's award of a counsel fee restricted to a percentage of Claimant's indemnity benefits only. We therefore affirm the Board in part, reverse in part, and remand with instructions to approve the Fee Agreement as written and award a counsel fee equal to 20% of Claimant's indemnity and medical benefits.

_____
PATRICIA A. McCULLOUGH, Judge

22

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Patrice Williams,              :
           Petitioner      :
                    :
           v.              :    No. 277 C.D. 2023
                    :
City of Philadelphia         :
(Workers' Compensation     :
Appeal Board),             :
           Respondent    :

## *ORDER*

AND NOW, this 21st day of March, 2024, the March 8, 2023 opinion and order of the Workers' Compensation Appeal Board (Board) is hereby AFFIRMED, IN PART, and REVERSED, IN PART. The Board's order is AFFIRMED with regard to the description of Patrice Williams' (Claimant) work injury. The Board's order is REVERSED with regard to Claimant's fee agreement with her counsel. This matter is remanded to the Board for further remand to the Workers' Compensation Judge (WCJ) with instructions to approve, as written, the fee agreement introduced before the WCJ as Claimant's Exhibit 3.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge